RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0168P (6th Cir.)
File Name: 02a0168p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

MARY ELLEN RODGERS,
Individually and as
Independent Personal
Representative for the Estate
of Philip J. Rodgers,
             *Plaintiff-Appellant,*

       *v.*

MONUMENTAL LIFE
INSURANCE COMPANY, a
Minnesota Corporation; and
AMERICAN EXPRESS, a New
York Corporation,
             *Defendants-Appellees.*

No. 00-2241

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 99-10184—David M. Lawson, District Judge.

Argued: November 29, 2001

Decided and Filed: May 9, 2002

Before: MERRITT, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Peter P. Patrick, PATRICK & KWIATKOWSKI, Cheboygan, Michigan, for Appellant. Elaine A. Parson, RAYMOND & PROKOP, Southfield, Michigan, for Appellees. **ON BRIEF:** Peter P. Patrick, PATRICK & KWIATKOWSKI, Cheboygan, Michigan, for Appellant. Elaine A. Parson, RAYMOND & PROKOP, Southfield, Michigan, for Appellees.

_____

**OPINION**

_____

CLAY, Circuit Judge. Plaintiff, Mary Ellen Rodgers,[1] appeals from the order entered by District Court Judge Victoria A. Roberts, on August 29, 2000, granting Defendants', Monumental Life Insurance Company's and American Express', motion for reconsideration and thereby entering summary judgement in favor of Defendants. Plaintiff also appeals from the order entered by District Court Judge David M. Lawson on October 4, 2000, denying Plaintiff's motion for reconsideration of the August 29, 2000, order.

This case is in federal court on the basis of diversity of citizenship pursuant to 28 U.S.C. §1332(a) with the amount in controversy being greater than $75,000. The matter involves a contract dispute arising out of a life insurance policy issued by Monumental Life Insurance Company ("Monumental"), which provided for accidental death benefits

---

[1] Pursuant to the district court's August 25, 2000, order, the parties have stipulated that Marcella C. Puchalski, who had thereupon been appointed as Personal Representative of Rodgers' estate, be substituted as Plaintiff herein due to the death of Mary Ellen Rodgers.

that Plaintiff is seeking on behalf of her insured husband. Plaintiff is challenging the district court's order finding that no genuine issue of material fact remained for trial and that Plaintiff is not entitled to benefits under the policy.

For the reasons set forth below, we **REVERSE** the district court's order granting Defendants summary judgment, and **REMAND** the case for trial with instructions for the court to rule upon Plaintiff's objections to the admission of Monumental's expert testimony based on Monumental's alleged failure to comply with Federal Rule of Civil Procedure 26(a).

## BACKGROUND
### Procedural History

On March 23, 1999, Plaintiff filed a complaint against Defendants seeking payment of benefits pursuant to an accidental death coverage policy issued by Defendant Monumental to Plaintiff's now deceased husband, Phillip Rodgers, wherein monthly premiums were paid by and through Rodgers' credit line held by Defendant American Express.[2] The case was removed to federal district court on April 22, 1999, and Defendants filed their answer to the complaint on April 29, 1999.

---

[2]The policy provision at issue states as follows:
ACCIDENTAL DEATH BENEFIT
When we receive due proof that you die, we will pay the benefit shown on the Schedule of Benefits to your named Beneficiary provided:
    (1) death occurs as a direct result of an Injury; and
    (2) death occurs within 365 days of the accident causing the Injury.
(J.A. at 377.)
    "Injury" for purposes of the policy is defined as "bodily injury caused by an accident. The accident must occur while the Covered Person's insurance is in force under the Group Policy. The Injury must be the direct cause of loss and must be independent of all other causes. The injury must not be caused or contributed to by Sickness." (J.A. at 376.)

The district court held a status conference and issued its scheduling order on November 15, 1999, thereby establishing December 22, 1999, as the date for Plaintiff to file her expert witness reports; January 19, 2000, as the deadline for identification of all witnesses, including experts; March 31, 2000 as the deadline for completing expert discovery; and April 28, 2000, as the date for filing dispositive motions.

On January 19, 2000, Monumental served and then filed its expert witness list naming Dr. Werner Spitz and Dr. G. F. Molinari as Monumental's experts. Six days later, on January 24, 2000, Monumental also served and filed its witness list. In the meantime, on January 21, 2000, Monumental had filed a motion to compel Plaintiff to provide full medical release/authorizations to Monumental, and issued numerous subpoenas for records to the fourteen doctors listed on Plaintiff's witness list. The district court issued an order granting Monumental's motion to compel and ordered Plaintiff to furnish signed medical authorizations for the treating physicians, the two hospitals and Emergency Medical Service, on or before February 4, 2000, together with letters of authority. Monumental then proceeded with discovery of Plaintiff's treating physicians. On March 22, 2000, Monumental served copies of the reports of Dr. Molinari and Dr. Spitz upon Plaintiff via facsimile transmission and regular mail.

Discovery concluded on March 31, 2000. Just a few days before, on March 28, 2000, Monumental had filed its motion for summary judgment and brief in support thereof; and Plaintiff filed her response in opposition and a reply brief.

On July 31, 2000, District Judge Roberts issued a written opinion and order denying Monumental's motion for summary judgment. Monumental filed a motion for reconsideration of the court's order on August 10, 2000. Thereafter, on August 29, 2000, Judge Roberts granted Monumental's motion for reconsideration, opining in relevant part:

these allegations of failure to comply with Rule 26. In her April 7, 2000, letter, counsel for Monumental reminded Plaintiff that it was not required to provide Plaintiff with the addresses and telephone numbers of Monumental's experts inasmuch as the Eastern District of Michigan had "opted out" of the requirements of Rule 26(a)(1) via its local rule 26.3. Although Eastern District local rule 26.3 in effect in January of 2000 expressly states that the district is no longer opting out, and that compliance with Fed. R. Civ. P. 26(a)(1) is now mandatory, local rule 26.3 in effect at the time in question did indicate that the Eastern District opted out of complying with Fed. R. Civ. P. 26(a)(1). As a result, Plaintiff's first allegation of noncompliance as listed above is without merit.

Furthermore, even if Plaintiff's other allegations are meritorious, sanctions under Fed. R. Civ. P. 37(c)(1) still may not be appropriate if Monumental's failure to comply with Rule 26 is determined to be "harmless." This question, though, is best left for the district court to address in the first instance, and we are at a loss as to why the district court did not do so when it initially denied Monumental's motion for summary judgment. In other words, when the motion for summary judgment was denied, it would appear that the district court then had reason to rule upon Plaintiff's motion inasmuch as the case was going forward. Because we are ordering the case to go forward at this time, Plaintiff's motion must therefore be considered.

### CONCLUSION

We **REVERSE** the district court's order granting Defendants summary judgment, and **REMAND** the case for trial with instructions for the court to rule upon Plaintiff's objection to the admission of Monumental's expert testimony based on Monumental's alleged failure to comply with Federal Rule of Civil Procedure 26(a).

2.)   26(a)(2)(B) was violated because Monumental failed to provide a written report from either of its experts until March 20, 2000, sixty-one days late under the scheduling order.

3.)   26(a)(2)(B) was violated because Monumental failed to provide the curriculum vitae of either expert witness until January 26, 2000, and February 4, 2000, 7 days and 16 days late, respectively.

4.)   26(a)(2)(B) was violated because a disclosure of an expert witness must be accompanied by exhibits in support of the expert's conclusion and no exhibits were provided as of the date of Plaintiff's filing her brief on appeal.

5.)   26(a)(2)(B) was violated because a disclosure of an expert witness must be accompanied by a list of publications authored by the witness in the preceding ten years, and these were not provided until January 16, 2000 and February 4, 2000, respectively.

6.)   26(a)(2)(B) was violated because disclosure of an expert witness must be accompanied by a list of cases in which the expert had testified within the proceeding four years, and Dr.Molinari's list of cases was not provided until March 27, 2000, while Dr. Spitz's list was never provided.

7.)   26(a)(2)(B) was violated because a disclosure of an expert witness must be accompanied by a disclosure of compensation paid to the witness for his study and testimony, and Dr. Molinari's fees were not provided until March 27, 2000, while Dr. Spitz' were never provided.

In their brief on appeal, Defendants offer nothing in response to Plaintiff's arguments on this issue. However, Monumental's attorney did respond via letter dated April 7, 2000, to Plaintiff's letter dated March 30, 2000, regarding

While Plaintiff's treating physicians may have opinions concerning Mr. Rodgers' cause of death, Plaintiff has come forth with no factual evidence to rebut Defendants' contention that no evidence was found on autopsy to support the treaters' opinions. In fact, one of the treating doctors.[sic], Dr. Johnson, specifically said that he would defer to the pathologist in proving or disproving fatty embolism as the cause of death.

In its Opinion of July 26th, the Court focused on whether or not the treating doctors's testimony would be admissible under *Daubert*, and did not further consider, assuming its admissibility, whether the testimony would create a genuine issue of material fact. Inasmuch as Defendants have demonstrated through unrebutted testimony that an "easy, fast and definitive" test can be performed to determine the presence of fatty embolism, and that such a test was done on Mr. Rodgers' body at autopsy and no fatty embolism was revealed, this court finds that there was a "palpable defect" by which the Court was misled in its earlier ruling. Correcting it results in a disposition in favor of the Defendants.

(J.A. at 33-34.)

Plaintiff then filed a motion for reconsideration of Judge Roberts' order. On October 4, 2000, District Judge Lawson, the judge to whom the case had been reassigned, denied Plaintiff's motion for reconsideration of Judge Roberts' order. Plaintiff thereafter filed a timely notice of appeal.

**Facts**

On July 15, 1998, sixty-six-year-old Phillip Rodgers was travelling at approximately sixty miles-per-hour on North Black Road in Benton Township, Michigan, when he apparently lost control of his vehicle as he rounded a curve and slid off the paved portion of the road onto the shoulder where the car rolled over before coming to a rest. As a result of this accident, Rodgers suffered a fractured left femur

(broken leg) and several contusions. Rodgers was transported to Community Hospital in Cheboygan, Michigan, seen by emergency room physician Dr. Michael Johnson, and later transferred to Northern Michigan Hospital ("NMH") in Petoskey, Michigan, where he died seven days later on July 22, 1998.

At NMH, Rodgers was treated by Dr. Paul Blanchard, who initially scheduled Rodgers to undergo surgery for his fractured leg on the evening of July 16, 1998. Rodgers was alert and cognizant of his surroundings after his accident. Dr. John Diedrich, an internist at NMH, was also called in as a consultant on Rodgers' case for the purpose of obtaining preoperative clearance. In his report, Dr. Diedrich noted:

HISTORY: Mr. Philip Rodgers is a 66-year-old gentleman with a history of Parkinson's disease, Shy-Drager syndrome, vasodepressor syncope, hypertension, hyperlipidemia, modest carotid stenosis, and status post permanent pacemaker placement. He also has a history of peripheral vascular occlusive disease and is status post resection of abdominal aortic aneurysm with aortofemoral bypass.

* * *

In reviewing his past record, he does have episodic hyper- and hypotension and has frequently had systolic blood pressures in the 100s range, as high as 160 to 180 range. He does have generally blood pressures since the accident in the range of 100-105 systolic. His current blood pressure is 98/60. In questioning him, he is slow to answer and does not have many details regarding his past or present history. He does have a history of chronic confusion, and that has not changed of late.

* * *

IMPRESSION: His perioperative risk for surgery is increased by Parkinson's disease, generalized vascular disease, and a pacemaker, but this is not excessive in view of the severity of his injuries. I believe that his

---

whether Rodgers died solely of a fat embolism as a direct result of the fractured femur that he sustained in the accident, and any argument made by Monumental that preexisting conditions caused Rodgers' death is for the jury to hear and weigh. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

## II.

Judge Roberts, and subsequently Judge Lawson, premised their favorable summary judgment rulings for Monumental on the testimony of Monumental's expert witness, Dr. Spitz. In doing so, however, neither judge considered Plaintiff's motion that the reports and testimony of Dr. Spitz should not be considered under Federal Rule of Civil Procedure 37(c)(1) inasmuch as Monumental violated Federal Rule of Civil Procedure 26(a). Obviously then, to the extent that Plaintiff's contention in this regard is meritorious, the very basis upon which Judge Roberts rendered her opinion – Dr. Spitz's testimony – would no longer be present and the outcome of the proceedings would necessarily be different.

As to the merits of Plaintiff's claim, Plaintiff argues that Monumental's alleged failure to comply with Fed. R. Civ. P. 26(a) as to Dr. Spitz and Dr. Molinari rendered any reports or testimony from these experts inadmissible under Fed. R. Civ. P. 37(c)(1). Rule 37(c)1) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, a hearing, or on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1).

Plaintiff's specific objections brought pursuant to Federal Rule of Civil Procedure 26(a) are as follows:

1.) 26(a)(1)(A) was violated because Monumental did not provide the addresses of their expert witnesses until January 24, 2000, 5 days late under the scheduling order.

8.  That fat emboli, totally composed solely of fat, are readily dissolvable in alcohol and are often undetectable on autopsy, especially if the tissue samples are not routinely processed and are not processed fresh as direct smears or frozen sections.

9.  Nothing I found in the autopsy of this patient would cause me to rule out the fact that Mr. Rodgers may have died of fat emboli complications from his fractured femur.

(J.A. at 465-66.) Accordingly, by virtue of Dr. Krzymowski's second affidavit, a question of fact remains not only between the opinions of Dr. Johnson and Dr. Spitz, but also between the opinions of Dr. Krzymowski and Dr. Spitz. This appears to be significant here inasmuch as like Dr. Spitz, Dr. Krzymowski is a pathologist, and Monumental attempted to elevate the opinion of Dr. Spitz over that of Dr. Johnson because Dr. Spitz examined the corpse, while Dr. Johnson examined Rodgers' live body.

In addition, we are not persuaded by Monumental's claim that Dr. Krzymowski's second affidavit should be stricken because it conflicts with his first affidavit. A review of the two affidavits does not support this argument. In fact, Dr. Krzymowski's second affidavit explains and supplements his first affidavit, but there is nothing contradictory between the two. Finally, we are not persuaded by Monumental's claim that Plaintiff has failed to demonstrate that Rodgers' death was not caused or contributed to by his preexisting conditions. Plaintiff's treating physician, Dr. Johnson, attributed Rodgers' death solely to a fat embolism caused as a direct result of the fractured femur that he sustained in the accident, and expressly opined that Plaintiff's preexisting conditions did not contribute to Plaintiff's death. Dr. Krzymowski, the pathologist who conducted Rodgers's autopsy, stated in his affidavit that fat emobli are not always present on autopsy and that he had not ruled this out as the cause of Rodgers' death. Viewing this evidence in the light most favorable to Plaintiff, a question of fact exists as to

injuries should be treated aggressively as indicated. . . . Overall, I see no other contraindications to surgery. . . .

(J.A. at 191-92.)

However, Rodgers' condition worsened that day such that he became very lethargic with decreased mental status evidenced by extreme drowsiness and unresponsiveness. As a result, at the recommendation of consulting physician Dr. Denise Sinke, Rodgers' surgery was canceled. In her report, Dr. Sinke noted that a CAT scan of Rodgers' brain was conducted and the results did not indicate any acute bleeding or other changes.

The next day, July 17, 1998, Rodgers' condition dramatically worsened, such that the progress notes indicted that Rodgers was suffering from pulmonary edema, and his breathing became so shallow that he had to be placed on a ventilator in order to breath. Five days later, after the family agreed that he should be removed from the life support, Rodgers expired.

An autopsy was performed on Rodgers' body by pathologist Dr. George Krzymowski, and upon completion thereof, Dr. Kryzmowski indicated the following as the "pathologic diagnoses:"

| Cause of Death: | Anoxic encephalopathy due to hypotensive event following motor vehicle crash. |
|---|---|
| Manner of Death: | Accident |

(J.A. at 217.)

Dr. Blanchard disagreed with the pathologic diagnosis as noted above. According to Dr. Blanchard, Rodgers died from fat emboli syndrome sustained as a direct complication from Rodgers' fractured femur. Specifically, when questioned at his deposition, Dr. Blanchard opined as follows:

Q:  Let me ask you that question first.  Could this fracture alone and just this fracture kill somebody?  Can you answer that question?
A:  Well, normally just fracturing the femur without any complications consequent to the fracture would not be a fatal injury.
Q:  Would you agree with the statement that, but for his pre-existing sicknesses, the accident and injuries he sustained in the accident would not be sufficient to cause his death?
A:  I would disagree with that statement.
Q:  And why would you disagree with that?
A:  Because I think Mr. Rodgers died because of the pulmonary complications induced by the fracture, the differential diagnosis being fat emboli syndrome, adult respiratory distress syndrome or infection.  But that seems less likely to me.
Q:  And that conclusion, then, that you've just given me is in disagreement with the autopsy report; isn't that true?
A:  It's in disagreement with these statements here on the autopsy report.

(J.A. at 160-61.)  Dr. Blanchard opined that Rodgers' cause of death was a fat embolism from the fracture site.  (J.A. at 156-57.)

Dr. Johnson similarly opined during his deposition as follows:

Q:  Do you have an opinion as to what the cause of Mr. Rodgers' death was and the events that led up to his death?
A:  I have a pretty good idea why he died, but it's not something that's provable, really.  Even at autopsy it's not always provable.  But in a patient with a long-bone fracture like this who suddenly deteriorate[s] mentally, the most likely thing would be what's called a fat embolism syndrome.

autopsy even though they might have been the cause of death, and Monumental's expert witness Dr. Spitz claiming that the presence of fatty emboli are easily detected through a simple test.  Accordingly, an issue of fact remained for trial as to which expert opinion was more credible.  Inasmuch as a reasonable juror may have found Dr. Johnson more credible, the issue is "genuine," and because establishment of this fact would affect the outcome of the lawsuit, the fact was "material."  *See Anderson*, 477 U.S. at 248.  In other words, a reasonable juror may have found in favor of Plaintiff based upon Dr. Johnson's testimony that fat emboli are not always detected on autopsy, as well as the testimony of Plaintiff's other treating physicians indicating their belief that Rodgers died of a fat emboli, thereby making summary judgment in favor of Monumental inappropriate.  *See id.*

Although Dr. Krzymowski stated in his affidavit that he did not detect the presence of fat emboli upon microscopic examination at autopsy, this statement goes to the weight that a juror may afford Dr. Johnson's testimony that fat emboli are not always present.  It does not, however, negate Dr. Johnson's testimony for purposes of summary judgment. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (finding that when reviewing a motion for summary judgment, the evidence and all reasonable inferences drawn therefrom is viewed in the light most favorable to the nonmoving party).

Moreover, in Plaintiff's motion for reconsideration, she submitted a second affidavit from the pathologist who conducted Rodgers' autopsy, Dr. Krzymowski, wherein Dr. Krzymowski averred:

6.  That at the time of my signing that Affidavit and also at the present time, I was not ruling out the possibility that this patient experienced fat emboli syndrome.
7.  That fat emboli are not always detectable on autopsy.

admissible for the purpose of establishing that Rodgers' died of a fat embolism directly related to the fractured femur that he sustained in the accident, the court later found in its opinion granting Monumental's motion for reconsideration and summary judgment, that the expert opinions from these physicians failed to establish "in fact" that Rodgers died of a fat embolism.

The district court then compared Plaintiff's evidence to the report from Monumental's expert, Dr. Werner Spitz, in which Spitz stated that "'the finding of fat emboli in microscopic sections is easy, fast and definitive.'" (J.A. at 33.) The court opined that "Plaintiff does not dispute that there is a way to determine the presence of fatty embolism." (J.A. at 33.) The district court also looked to Dr. Krzymowski's initial affidavit wherein he found no fat emboli on microscopic examination. Based upon this evidence, the court concluded that "[i]nasmuch as Defendants have demonstrated through unrebutted testimony that an 'easy, fast and definitive' test can be performed to determine the presence of fatty embolism, and that such test was done on Mr. Rodgers' body at autopsy and no fatty embolism was revealed, this court finds that there was a 'palpable defect' by which the Court was misled in its earlier ruling. Correcting it results in a disposition in favor of the Defendants." (J.A. at 34.)

The record does not support the district court's finding that "Plaintiff does not dispute that there is a way to determine the presence of fatty embolism." Indeed, through the affidavit of Dr. Johnson, Plaintiff disputed the issue of whether there is a way to determine fatty embolism on autopsy. Specifically, Dr. Johnson opined in reference to his belief that Plaintiff died of a fat embolism that "it's not something that's provable, really. Even at autopsy it's not always provable." (J.A. at 251.) Therefore, the district court had before it on Monumental's motion for reconsideration of the denial of summary judgment the conflicting opinions of two expert witnesses: Plaintiff's expert witness Dr. Johnson claiming that the presence of fatty emboli are not always present on

There's fat inside your bones. And if you break them and they get into the bloodstream, they can embolize to your cerebral vessels, and that's fatal usually. Or certainly nearly fatal.

I would guess in his case that's probably what happened. He never showed signs of sort of cardiac decompensation or something like as associated heart attack or something like that. So that'd be the first – that'd be my best guess.

Q: And can you explain how that would work exactly, the fat embolism you've talked about? Is it – I mean, where would the fat come from, –

A: The fat comes from –

Q: – and where would it go to?

A: The fat comes from – all bones, believe it or not, have fatty tissue in them in the marrow. And there's not much you can do about it really. Sometimes when the long bones break, which is the one most associated with a fat embolism, you know, it gets into your bloodstream. I mean, there's arteries and veins in the area. And any tissue that's there can get into your blood and your circulation, and then it travels through your circulation and can embolize, which means go from your heart up to your head, your cerebral vessels.

Once it does that, it blocks them off, and you have basically as stroke. It's not common, but it's – I mean, it's not rare. It happens. And we worry about it. But you can't do anything to prevent it. And once it happens, all you can do is try and support patients. But you can't really do much about it.

Q: There's no medication that you can give to –

A: To prevent it? Not that I'm aware of. It's a rare but basically unpreventable complication of a long-bone fracture.

Q: Okay. So the fat the would have gone from the area of the fracture –

A: Right.

Q: – to the brain?

A:  Right.  It plugs up the artery, which plugs up –
    which then denies oxygen to the brain tissue that
    requires that arterial flow, which is what a stroke is.
    It's what an embolic stroke is.

(J.A. at 251-53.)

Finally, in response to defense counsel's questions as to whether he was of the opinion that Rodgers died of pre-existing conditions, Dr. Johnson opined:

A:  No.  I think he – I think he died of a fat embolism.
    I think that came from his trauma, which is a
    fractured femur.  And I don't think that his – that
    that whole scenario had anything to do with his pre-
    existing conditions, whatever they were.

(J.A. at 263.)

As noted previously, Monumental attempted to prevent Plaintiff from admitting the testimony of Dr. Johnson as well as Dr. Blanchard into evidence when Defendant filed its motion for summary judgment.  However, in her order denying Monumental's motion for summary judgment, Judge Roberts found that the testimony of these two physicians could be admitted and considered.  Plaintiff, in turn, sought to have the reports and testimony of Monumental's experts, Dr. Spitz and Dr. Molinari, kept out of evidence pursuant to Federal Rule of Civil Procedure 37(c)(1), inasmuch as Monumental failed to comply with Federal Rule of Civil Procedure 26(a) by allegedly failing to submit its expert witness list on a timely basis, failing to submit the addresses of the witnesses in violation of 26(a)(1)(A), failing to submit written reports signed by the witnesses on a timely basis in violation of 26(a)(2)(B), failing to disclose curriculum vitae of the experts on a timely basis in violation of 26(a)(2)(B), failing to provide a list of exhibits to support the witnesses' conclusions in violation of the rule, failing to provide a list of the witnesses' publications on a timely basis in violation of

the rule, and a few other violations.  Judge Roberts found that because she was denying Monumental's motion for summary judgment, she need not consider Plaintiff's claim that the testimony and reports of Monumental's experts should not be considered.

## DISCUSSION

### I.

This Court reviews a district court's grant of summary judgment *de novo*.  *See Weeks v. Portage County Executive Offices*, 235 F.3d 275, 278 (6th Cir. 2000).  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue of fact is "genuine" if the evidence is such that a reasonable trier of fact could return a verdict for the nonmovant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The substantive law identifies facts that are "material."  Facts are "material" only if establishment thereof might affect the outcome of the lawsuit under governing substantive law.  *Anderson*, 477 U.S. at 248.  A complete failure of proof concerning an essential element necessarily renders all other facts immaterial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  When reviewing a motion for summary judgment, the evidence and all reasonable inferences drawn therefrom are viewed in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In the order granting Monumental's motion for summary judgment, the district court found that "Plaintiff presented no evidence that Rodgers did, in fact, die from a fatty emboli." (J.A. at 33.) In other words, although in its opinion denying Monumental's motion for summary judgment, the court found the expert opinions from Rodgers' treating physicians